LILLIAN ARONSON, Plaintiff-Appellee and Cross-Appellant, *v.*
NORTH PARK COLLEGE, Defendant-Appellant and Cross-Appellee.

First District (1st Division)    Nos. 80-383, 80-1817 cons.

Opinion filed February 2, 1981.—Rehearing denied April 13, 1981.

Smith & Munson, Ltd., of Chicago (James G. Meyer, of counsel), for appellant.

Wayne B. Giampietro and Gregory N. Freerksen, of Chicago (DeJong, Poltrock & Giampietro, of counsel), for appellee.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Lillian Aronson (plaintiff) brought this action against defendant North Park College (or NPC), a private school, as a result of her dismissal as a student. After a bench trial, plaintiff was awarded damages of $22,321.60. Defendant appeals and plaintiff seeks an increase in damages by cross-appeal.

Plaintiff originally filed a complaint against defendant and other named persons in the United States District Court for the Northern District of Illinois. That action alleged a violation of plaintiff's civil rights as a result of her dismissal from NPC. The case was dismissed because plaintiff's attorney failed to appear for a status report. The court of appeals affirmed the dismissal.

Plaintiff filed a second suit in Federal District Court again alleging a violation of her civil rights and also a violation of the oral contract between the parties. An order was entered based upon res judicata granting defendant's motion to dismiss "all claims except those relating to the breach of contract claim." Thereafter, an order was entered dismissing the breach of contract claim for lack of Federal jurisdiction. Plaintiff appealed to the court of appeals, but subsequently dismissed this appeal on her own motion.

On January 8, 1975, plaintiff filed the instant action in the circuit court. Her amended complaint was also based on plaintiff's dismissal from NPC in 1967. Count I alleged a breach of contract. Count II alleged a violation of plaintiff's constitutional rights. Count III alleged an arbitrary and a negligent violation of her right to privacy. The trial court dismissed count II on the basis of res judicata and count III as being barred by the statute of limitations. The trial proceeded only on the breach of contract claim as alleged in count I.

The evidence shows that on January 25, 1966, plaintiff applied to NPC for admission as a student. She was accepted and completed one evening course in the spring and another in the summer of 1966. That fall, she enrolled as a full-time student.

In November 1966, plaintiff received a notice from the dean of students to take the Minnesota Multiphasic Personality Inventory Test (MMPI). This test was developed by the University of Minnesota and consists of 566 objective questions. There is evidence that this test is a well-regarded psychological examination and that all incoming students were required to take it. As a result of their scores, some students were referred to the Covenant Counseling Center (counseling center) for a review of their test score. On the basis of this review, the counseling center would decide if further counseling was necessary. Plaintiff testified she received no information about psychological testing before her fall enrollment.

Plaintiff subsequently took the test, which was graded at the University of Minnesota. Pursuant to standard procedure, the counseling center staff reviewed plaintiff's score. Because her results showed a deviation from normal, the center notified NPC. In February 1967, plaintiff received a notice to go to the counseling center for interpretation of her score. She did not appear for her scheduled appointment. The dean of students, Carroll J. Peterson, sent plaintiff a letter requesting her to appear at the center or face dismissal. In a telephone conversation, Dean Peterson told plaintiff she would be obliged to appear at the center several times and this procedure was required of 5 to 10 percent of all NPC students.

On February 21, 1967, plaintiff had a 30-minute interview with William O. Hunt, a student psychologist at the counseling center. During this interview she was given another personality test. Plaintiff returned to the counseling center on March 28, 1967, to fill out a biographical questionnaire. When asked when she would return, plaintiff sought out Mr. Hunt, protested, and departed. Mr. Hunt subsequently prepared a report dated March 28, 1967, describing plaintiff as "frightened and running" or "slightly below average in intelligence" and with symptoms of "blocking" and "denial."

Plaintiff returned to the counseling center on May 9, 1967, for a brief interview with Dr. Richard Cox, a clinical psychologist. On May 11, Dean Peterson received the following memorandum from Dr. Cox concerning plaintiff:

> "The above named student was seen as a result of MMPI deviations. Further interviews reveal a pronounced, chronic paranoid condition which will be a serious detriment to herself and others. This is particularly serious inasmuch as she plans to enter the field of education. She is totally unaware of her condition, unwilling to involve herself in treatment and therefore at this time renders herself untreatable. This student does not possess sufficiently strong mental health to continue the pursuits of college or an educational career at this time."

On the basis of this memorandum, Dean Peterson wrote plaintiff a letter informing her of her dismissal from NPC at the end of the term due to her lack of "sufficiently strong mental health."

A meeting of the counseling center staff was held on May 16, 1967. Dr. Truman Esau, the staff psychiatrist, attended. The staff as a whole diagnosed plaintiff as being in a "paranoid state."

Between July 1967 and June 1968 plaintiff had several contacts with Dean Peterson and other NPC officials concerning readmission. She requested the school to contact her then current psychiatric therapist. On June 19, 1968, Dean Peterson refused plaintiff's request for readmission due to her mental status. Subsequently, on July 9, 1968, Dean Peterson received the following memorandum from Dr. Esau:

> "This will confirm that I have had a contact from Dr. Francis Parks who is the therapist of Lillian Aronson. It is my understanding from my conversation that the patient's personality characteristics are unaltered. Any behavioral difficulty that you experienced with her would likely be recurrent."

Plaintiff was granted permission to return to NPC in June 1969, but enrolled in another college.

The parties stipulated as to the testimony of two psychologists and

one psychiatrist who would testify the personality test relied upon is not a reliable screening device and the diagnoses of plaintiff were therefore inaccurate. However, all three admitted they had not examined plaintiff in 1967. Two of them conceded that if they had, their opinions might change. Stipulated testimony was also entered from seven of plaintiff's personal and business associates that plaintiff exhibited no signs of mental disorder.

In this court, defendant contends: the trial court should have dismissed the action on the theory of res judicata; the judgment is contrary to law because it involved the dismissal of plaintiff from a private college; and, alternatively, plaintiff is not entitled to an increase in damages.

## I.

■■ As shown, count III of the amended complaint alleged the defendant NPC was guilty of "arbitrary and discriminatory and unlawful conduct" and of "a negligent or wilful invasion of plaintiff's right to privacy * * *." This count was dismissed prior to trial. Count II alleged defendant was guilty of "arbitrary and discriminatory" actions which deprived plaintiff of her right to due process of law. Count II was dismissed by the trial court in the final order appealed from. No point is raised or argued by plaintiff on this dismissal, and the issue is therefore waived. Ill. Rev. Stat. 1979, ch. 110A, par. 341(e)(7); *Village of Crainville v. Argonaut Ins. Co.* (1980), 81 Ill. 2d 399, 405, 410 N.E.2d 5.

Count I was therefore the only remaining count. The gist of that count is simply an allegation defendant "breached the written contract" between the parties. This contract consisted of the college catalog, bylaws and other pertinent written regulations.

Defendant contends the trial court erred in refusing to dismiss count I since plaintiff's cause of action was barred by res judicata. This argument by defendant is predicated on its theory that "dismissal of the original Federal Court lawsuit, 73 C 245, was a judgment 'on the merits.' " If a subsequent action is to be barred by res judicata the initial judgment must be "upon the merits." See *Towns v. Yellow Cab Co.* (1978), 73 Ill. 2d 113, 122, 382 N.E.2d 1217.

Plaintiffs' second Federal suit was dismissed on the ground of res judicata on the civil rights claim and lack of Federal jurisdiction on the breach of contract claim. The decisive issue in this court is the effect of the Federal court action on count I of the instant case.

The original Federal action was dismissed because plaintiff's attorney failed to appear in court for a status report. Supreme Court Rule 273, (Ill. Rev. Stat. 1979, ch. 110A, par. 273) provides:

"Unless the order of dismissal or a statute of this State *otherwise specifies*, an involuntary dismissal of an action, other than a

dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits." (Emphasis added.)

However, when plaintiff filed her action in the trial court, section 24 of the Limitations Act (Ill. Rev. Stat. 1975, ch. 83, par. 24a) provided, in part, that where an "action is dismissed for want of prosecution then, whether or not the time limitation for bringing such action expires during the pendency of such suit, the plaintiff * * * may commence a new action within one year or within the remaining period of limitation, whichever is greater, after such * * * action is dismissed for want of prosecution."

"In *Kutnick v. Grant* (1976), 65 Ill. 2d 177, 357 N.E.2d 480, section 24 of the Limitations Act was determined to be a statute that 'otherwise specifies' within the meaning of Rule 273." (*Bruer v. Livingston County Board of Zoning Appeals* (1978), 66 Ill. App. 3d 938, 940, 383 N.E.2d 1016.) In *Kutnick*, plaintiff's original action was also dismissed for want of prosecution when his attorney failed to appear at a regular call of cases. Defendant contended the dismissal of the original action for want of prosecution "operated as an adjudication of the plaintiff's case on the merits under our Rule 273 * * * and thus barred the filing of the plaintiff's second complaint." 65 Ill. 2d 177, 180.

The supreme court dismissed defendant's argument, stating (65 Ill. 2d 177, 180-81):

"The defendant argues that the portion of section 24 of the Limitations Act quoted above is not a statute that 'otherwise specifies' within the meaning of Rule 273. The argument is hardly convincing. If one interprets Rule 273 as the defendant would have us do, that part of section 24 which is involved here would be meaningless. If the defendant's reading of the section were to be adopted, every suit dismissed for want of prosecution and reinstated or filed again pursuant to section 24 would be vulnerable to dismissal under Rule 273. It cannot be reasonably contended that this was the intent of the legislature in enacting section 24. Section 24 plainly states that if a suit is dismissed for want of prosecution a new action may be filed within one year of the dismissal. * * *."

■■ Thus, we conclude res judicata is not applicable to bar count I.

## II.

The record shows, and it is conceded, there was a written contract between these parties. Plaintiff's brief sets out the pertinent documents which constitute the contract.

On January 25, 1966, plaintiff signed and tendered a written application for admission to NPC. Various blanks in this form have been filled

in by typewriter and in plaintiff's handwriting. Plaintiff signed this application. Immediately above plaintiff's signature the following printed language appears:

> "If my application for admission is accepted, I agree to abide by all regulations of the institution and to respect its traditions. I certify that to the best of my knowledge the statements made in this application are correct and complete."

The college catalog issued by NPC for 1964 to 1966 contains the following provisions:

> "The Counseling Center, 3417 West Foster, is jointly sponsored by North Park and Swedish Covenant Hospital. Its staff consists of a psychiatrist, a clinical psychologist, a psychiatric social worker and an intake counselor. The Center is equipped to handle a variety of psychological problems.
>
> This service is available to any student upon his request or by referral. Appointments may be made by consulting the intake counselor in the Center. The initial evaluation is without charge. There is a charge for treatment. Students may be assured of the confidentiality of these interviews."

Another portion of this college catalog provides:

> "The institution reserves the right to dismiss at any time a student who in its judgment is undesirable and whose continuation in the school is detrimental to himself or his fellow students. Such dismissal may be made without specific charge. Students who have been suspended or expelled will receive no refund of moneys paid to the school."

It is plaintiff's theory that liability arises because the evidence shows NPC has acted in an arbitrary and capricious manner. Plaintiff urges NPC breached its written assurance of confidentiality, required plaintiff to report for psychiatric counseling and terminated the status of plaintiff as a student. Plaintiff urges that whether the conduct of defendant as shown by the record was arbitrary and capricious is an issue of fact. Defendant contends the judgment of the trial court is contrary to law, and courts have no authority to review dismissal of a student from a private college.

The single Illinois decision relied upon by plaintiff is *DeMarco v. University of Health Sciences Chicago Medical School* (1976), 40 Ill. App. 3d 474, 352 N.E.2d 356. There, in plaintiff's application for admission to the private school, he answered "no" to the question, "Have you attended another medical school?" Plaintiff completed all but the last six weeks of his final year. The school ascertained plaintiff had, in fact, previously attended another medical school. After discussion, plaintiff and the school agreed plaintiff would enter the armed forces and would be re-admitted

if honorably discharged. Plaintiff complied with these conditions, but later the school refused to re-admit plaintiff unless he made a pledge for a contribution to the school. The majority of this court held plaintiff was entitled to receive his academic degree.

It is manifest that the facts in *DeMarco* differ sharply from the instant case. In *DeMarco*, there was no contractual obligation upon the student to make any contribution to the school. On the contrary, in the instant case the reason for the separation of plaintiff is clearly stated in and justified by the contract between the parties. The abstract principle for which *DeMarco* stands (40 Ill. App. 3d 474, 480), was quoted by the supreme court in a class suit, *Steinberg v. Chicago Medical School* (1977), 69 Ill. 2d 320, 332, 371 N.E.2d 634, as follows:

> " 'A contract between a private institution and a student confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced. [Citations.]' "

We find the same principle well stated in *Eisele v. Ayers* (1978), 63 Ill. App. 3d 1039, 381 N.E.2d 21. There, a class action was brought by students to enjoin a proposed tuition increase. This court affirmed an order dismissing the case on the theory that a tuition increase did not violate the contract between the students and the school which was based upon the catalogs issued by the school. The court held (63 Ill. App. 3d 1039, 1044):

> "The catalogues which formed the basis of the contract between the parties reserved to defendants the right to increase tuition. Nothing in the complaint indicates that defendants have exercised this right maliciously or in bad faith. In the absence of such allegations, defendants may not be coerced in the lawful exercise of their discretion."

In support of this position, the court cited *People ex rel. Tinkoff v. Northwestern University* (1947), 333 Ill. App. 224, 77 N.E.2d 345; *Manson v. Culver Military Academy* (1908), 141 Ill. App. 250; and also *Basch v. George Washington University* (D.C. App. 1977), 370 A.2d 1364, dealing with a tuition increase and reaching the same result.

In the present case, precisely as in *Eisele*, count I contains no allegation of bad faith or malicious conduct by NPC. There is no allegation of arbitrary and capricious conduct. Count I simply alleges NPC "breached the written contract."

Applying the teaching of *Eisele* to the case before us, NPC, as a private college, had complete right to enforce reasonable regulations for the proper conduct of the school. By signing the application for admission, plaintiff agreed to abide by all regulations of NPC. The catalog clearly provided for counseling upon request "or by referral." The defendant specifically reserved the right to dismiss at any time any student who in

defendant's judgment was "undesirable and whose continuation in the school is detrimental to himself or his fellow students." The provision is clear that "Such dismissal may be made without specific charge." In our opinion, this record presents no evidence of arbitrary, capricious, malicious or improper conduct by NPC.

■■ The sole issue here is whether defendant acted in accordance with and within the limitations of the written contract between the parties. The evidence shows a memorandum was sent to NPC by Dr. Richard H. Cox, a fully qualified psychologist. NPC was informed thereby that plaintiff suffered from a "chronic paranoid condition which will be a serious detriment to herself and others." It must be remembered Dr. Cox was not an official of defendant but was associated with the independent counseling center. It was only after receiving this information that defendant advised plaintiff in writing she would not be permitted to continue her studies at defendant school after expiration of the term. In addition, defendant received a later memorandum from Dr. Truman G. Esau, also associated with the North Park Clinic. He advised plaintiff's personality characteristics were unaltered and behavioral difficulty with plaintiff "would likely be recurrent."

Furthermore, this record shows no reason for NPC or its staff to have any doubts or misgivings concerning the accuracy of the information regarding plaintiff's condition as presented by the counseling center. We expressly reject the contention of plaintiff that there was an agency relation between NPC and the counseling center. It is correct that the center is housed in a building owned by NPC. Although NPC did provide some portion of the funds for the counseling center, the record shows the center was also funded by Swedish Covenant Hospital. The Illinois Department of Mental Health also participated in funding the center and required the center to provide services to the surrounding community. The counseling center provided its independent service not only to NPC but also to Wheaton College and Olivet Nazareth College. In addition, there was no overlapping of personnel between NPC and the counseling center. No member of the counseling center staff was in any manner connected with NPC.

Thus, we find here a complete lack of any evidence of bad faith, malicious conduct or arbitrary and capricious action by NPC. In view of the information presented to the college authorities as above shown, it was incumbent upon them as part of their duties to effect a separation of plaintiff from the college. In the trial court, this case proceeded upon the theory that the dispositive issue was the truth or falsity of the information given to NPC by the counseling center. Plantiff's able counsel on appeal did not participate in the trial court. Plaintiff produced evidence from her friends and other persons as above shown regarding the alleged actuality

of plaintiff's mental condition. However, the matter should properly have been presented upon the issue above discussed as to whether NPC acted with propriety and within the terms of the contract between the parties by accepting the diagnostic opinion which emanated from the counseling center.

We accordingly conclude defendant NPC is without liability in this situation.

In view of the above, it is unnecessary for us to consider plaintiff's cross-appeal asking an increase in the amount of damages allowed by the trial court.

For these reasons the judgment appealed from is reversed.

Judgment reversed.

McGLOON and CAMPBELL, JJ., concur.